**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| United States of America, | |
| *Plaintiff*, | Civil Action No. _____ |
| *ex rel*. [Filed Under Seal], | |
| *Plaintiff-Relator*, | **COMPLAINT** |
| *v*. | **(Jury Trial Demanded)** |
| [Filed Under Seal], | |
| *Defendants*. | |

# FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) (Exempt from ECF)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

United States of America,

          *Plaintiff,*

*ex rel.* Maurice Shoe,

          *Plaintiff-Relator,*

      *v.*

North Greenville University, San Diego
Christian College, and Oral Roberts
University,

          *Defendants.*

**FILED UNDER SEAL**

Civil Action No. _____

**COMPLAINT
(Jury Trial Demanded)**

## INTRODUCTION

1.     Defendants North Greenville University ("**NGU**"), San Diego Christian College ("**SDCC**"), and Oral Roberts University ("**ORU**") have violated the Higher Education Act, Pub. L. No. 89-329, 79 Stat. 1219, 1232-54 (1965) ("**HEA**"), as it applies to the incentive compensation rules by contracting in a tuition-sharing capacity with a college recruiter known as Joined Inc. ("**Joined**"). Not only did Joined engage primarily in recruiting and enrolling college students, but NGU holds a 33% ownership in Joined and controlled its Board of Directors.

2.     Every year, Congress provides more than $150 billion in federal grants and loans to institutions that enroll students in qualified educational programs. The United States Department of Education ("**DOE**") administers these programs, which were established under Title IV of the HEA, 20 U.S.C. §§ 1070 *et seq.*

3.     As a condition of serving students who benefit from Title IV funding, schools are required to abide by the applicable statutes and DOE regulations and to sign a "Program

Participation Agreement." Specifically, as a condition of both eligibility and payment of funds under Title IV programs, schools are precluded from paying referral or contingency fees to recruit students and from entering into tuition-sharing agreements with parties affiliated with *any* educational institute that provide bundled services including the recruitment of students.

4.     Both Defendants receive financial aid for their students through various programs under Title IV. They have violated statutory law, 20 U.S.C. § 1094(a), (a)(1), (a)(20), and DOE regulations, 34 C.F.R. § 668.14(b)(22)(i), by paying commissions, bonuses, and/or incentive payments for recruiting students for enrollment and by using federal funds as the source of these payments.

5.     Ninety-five percent of NGU's 2,300 students receive Title IV financial aid from the United States Government. Through its former President James Epting, current President Randall Pannell, Vice President of Admissions Keli Sewell, and other University officials, NGU established, financed, and assumed a 33% equity interest in Joined, which was tasked with recruiting students for NGU's on-line and satellite programs. By covert agreement, NGU paid commissions, bonuses and/or incentive payments to Joined calculated as a contingent fee of 50% of the gross tuition collected for each student that Joined recruited to an NGU program. NGU has not disclosed this financial arrangement to its students. Further, it holds out Joined's employees as NGU employees, including providing them with NGU business cards, NGU titles, NGU email addresses, NGU office space, and training and directions from NGU officials. And NGU has not disclosed any of this to the DOE, whose Title IV taxpayer dollars – slated for education by statute – have been diverted to finance an unlawful recruiting campaign. NGU engaged in this illegal conduct to boost its enrollment revenue and to line the pockets of NGU officials James Epting and Keli Sewell, both of whom benefit financially from Joined's success.

6.     Defendants SDCC and ORU entered into similar tuition-sharing agreements with Joined to recruit students for their online programs despite the fact that the majority of their students receive some form of Title IV funding and despite knowing that NGU had a 33% ownership interest in Joined.   SDCC and ORU also held out Joined's employees as their own employees, including providing them with business cards, titles, email addresses, office space, and training and directions from school officials.    These arrangements have not been disclosed to SDCC or ORU students or to the DOE.

7.     Defendants' conduct violates 20 U.S.C. § 1094(a)(20) because they made direct payments to for-profit recruiter Joined with the federal dollars that were earmarked for tuition. The rules – designed to prohibit self-serving arrangements such as the contracts at issue here – allow schools to share tuition with a recruitment service provider.  At most, a school may share tuition with a service provider only if a) the provider provides "bundled services," not just recruitment services, and b) the provider is a third party unaffiliated with *any* educational institution.  The express purpose of the agreements between Joined and NGU, SDCC and, ORU was for Joined to recruit students for those schools.  And Joined is plainly affiliated with NGU.

8.     Defendants' conduct violates federal statutes and regulations, thus disqualifying them from benefiting from the receipt of any Title IV funds.  They have defrauded the DOE and should be forced to return all Title IV funds distributed during the time of violation.

9.     Through the unlawful conduct alleged herein, Defendants NGU, SDCC, and ORU have also violated the False Claims Act 31 U.S.C. § 3729, *et. seq*. and are liable for damages, civil penalties, and such other relief as accorded by law.

10.     Relator has served a copy of the complaint and a written disclosure of substantially all material evidence and information he possesses on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure before filing this *qui tam* action.  *See* 31 U.S.C. § 3730(b)(2).

## JURISDUCTON AND VENUE

11.     Relator brings this action on behalf of himself and on behalf of the United States for violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

12.     This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

13.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in or transact business in this District.  In addition, many of the acts prohibited by 31 U.S.C. § 3729 occurred in this District.

14.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

15.     Relator is unaware of any public disclosure of the allegations herein.  To the extent there has been a public disclosure unknown to the Relator, he is the "original source" under 31 U.S.C. § 3730(e)(4).  Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing this *qui tam* action based on that information.  *See id.*

## PARTIES

16.     Relator **Maurice "Buddy" Shoe** (hereinafter "**Shoe**" or "**Relator**") is the President of Joined, a California corporation.  He is also a Board member of Joined and a minority owner of Joined. Relator Shoe learned in or about the Winter of 2015 that the relationship between Joined and NGU was unlawful and that with NGU's counsel and advice (through at least participation on

Joined's Board of Directors), Joined had been caused to engage in illegal relationships with NGU and other universities.

17.    Founded in 1892 as North Greenville High School, Defendant **North Greenville University** is a nonprofit educational institution located in Tigerville, South Carolina, just outside of Greenville, South Carolina, offering undergraduate, graduate and online studies. It describes itself as "one of the most notable Christian universities in the Southeast and the nation." Over the past 24 years, predominantly during the presidency of James Epting, NGU has grown from 300 students to an institution with a student population exceeding 2,300. More than 95% of the students who attend NGU benefit from United States Government funds provided pursuant to Title IV of the HEA.

18.    Defendant **San Diego Christian College**, located in San Diego California, "exists to educate and inspire students through the truth of Scripture." It offers undergraduate, graduate and online studies. More than 95% of SDCC students receive financial assistance, including Title IV funding.

19.    Defendant **Oral Roberts University**, based in Tulsa, Oklahoma, is a nonprofit educational institution. It describes itself as an interdenominational, Christian, comprehensive liberal arts university with an enrollment of about 3,335 students. It offers undergraduate, graduate and online studies. Most of its students receive Title IV funding.

## LEGAL BACKGROUND

20.    NGU, SDCC, and ORU have violated the HEA as it applies to the incentive compensation rules, 20 U.S.C § 427(a)(20), by contracting in a tuition-sharing capacity with Joined Inc., a company in which NGU holds 33% ownership, to provide recruitment services.

21.    Although not mentioned in either the statutes or regulations, service providers purportedly may be compensated on the basis of enrollment or tuition if they are unaffiliated third

parties and satisfy a so-called "bundled services" exception to 20 U.S.C § 427(a)(20).  Assuming such an exception exists, which Relator does not concede, Defendants did not qualify for the "bundled services" exception because the majority of the services Joined provided to Defendants involved recruitment, enrollment, and re-enrollment.   Therefore, Defendants improperly compensated Joined on the basis of tuition.

22.    Further, Defendants have violated the law because the rules provide that a contractor with whom a school shares tuition must be a "third party" that is "unaffiliated" with *any* educational institute. Joined is plainly affiliated with NGU, a fact known by both SDCC and ORU. Joined's receipt of a portion of the tuition paid to Defendants by the students Joined enrolled for each school is a violation of the HEA and the incentive compensation ban.

23.    It is a violation of the False Claims Act to obtain federal funds through the use of false or fraudulent claims and statements.  31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B).  By failing to comply with the incentive compensation statutes and regulations, NGU has defrauded the DOE and should be forced to return all Title IV funds distributed during the time of violation.

## I.    THE HIGHER EDUCATION ACT

24.    Through Title IV of the HEA, Congress established various student loan and grant programs to assist eligible students in financing post-secondary education.   Although the mechanisms by which Title IV funds are disbursed vary by program, all Title IV, HEA programs require compliance with specific conditions as a prerequisite to obtaining payments.

### A. OBLIGATIONS PARTICULAR TO RECEIPT OF TITLE IV FUNDING

25.    In order to become – and remain – eligible to receive Title IV funding, an educational institute must enter a program participation agreement ("PPA") and remain in compliance with HEA requirements.  Title 20 U.S.C. § 1094(a) sets forth the requirements for receiving Title IV HEA funds, stating, in relevant part:

> . . . In order to be an eligible institution for the purposes of any [Title IV, HEA] program [], an institution must be an institution of higher education or an eligible institution … and **shall … *enter into a program participation agreement with the Secretary***. The agreement shall condition the initial and continuing eligibility of an institution to participate in a program upon compliance with the following requirements….

*Id.* (emphasis added).

26.    Among the requirements, 20 U.S.C. § 1094(a)(1) states, "The institution will use funds received by it for any program . . . solely for the purpose specified in and in accordance with the provision of that program."

27.    In each PPA, including the PPAs executed by Defendants, schools agree that "[t]he execution of this Agreement by the Institution and the Secretary is a prerequisite to the institution's initial or continued participation in any Title IV, HEA Program." The institution further "understands and agrees that it is subject to and will comply with the program statues and implementing regulations."

28.    In executing a PPA, a school agrees in several separate provisions that it "will comply" with certain regulations, or "will take" certain actions, or "will provide," or "will not" undertake certain actions. Compliance with a PPA and its incorporated regulations and statutes is both a condition of participation and a condition of payment for Title IV funds. See 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14(a)(1).

29.    Also, DOE does not provide Title IV funds directly to students. Instead, it established a framework for each school to manage, spend, and account for Title IV funds, from start to finish. DOE relies on schools to exercise fiduciary obligations in their cash management of Title IV funds.

30.    In each instance a school makes a specific request to draw Title IV, HEA funds, it certifies that it will disburse monies in compliance with the PPA. During the relevant period here,

Defendants made hundreds of drawdowns of Title IV funds and with each request, certified that federal funds would be administered and spent in accordance with the program rules.

### B.    REVENUE-SHARING WITH RECRUITMENT SERVICE PROVIDERS

31.    One of the conditions for receiving Title IV funds is Section 487(a)(20) of the HEA, as amended, 20 U.S.C. § 1094(a)(20), which generally prohibits an eligible educational institution from providing incentive compensation to employees or third-party entities for their success in securing student enrollments or the awarding of Title IV HEA program funds.

32.    Known as the "incentive compensation ban," 20 U.S.C. § 1094(a)(20) states:

> The institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance, except that this paragraph shall not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal student assistance.

33.    The statute provides only one exception to the ban – the recruitment of foreign students ineligible for Title IV funding.  *Id.*

34.    On October 29, 2010, the DOE published in the Federal Register final regulations on program integrity issues, generally effective on July 1, 2011. 75 FR 66832.  The final regulations made a number of changes to the rules governing the programs authorized by the HEA. Included in these regulations were changes to the incentive compensation regulation, 34 C.F.R. § 668.14(b)(22), which were intended to "align the regulations with the statute and ***comprehensively ban*** the use of commissions, bonuses, and other direct forms of compensation based on success in securing enrollments or the award of financial aid" and "achieve the goals intended by the Congress."  75 FR 66832 at *66872 (emphasis added).  The changes eliminated several "safe harbors" that had existed because DOE had determined they allowed educational institutions to circumvent the incentive compensation ban.

9

35.     The DOE has explained that to "determine if a payment or compensation is permissible under section 487(a)(20) of the HEA", requires application of a two-part test, namely:

> (1) Whether it is a commission, bonus, or other incentive payment, defined as an award of a sum of money or something of value paid to or given to a person or entity for services rendered; and

> (2) Whether the commission, bonus, or other incentive payment is provided to any person based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, which are defined as activities engaged in for the purpose of the admission or matriculation of students for any period of time or the award of financial aid.

> If the answer to each of these questions is yes, the commission, bonus, or incentive payment would not be permitted under the statute.

75 FR 66832 at *66873.

36.     As amended, 34 C.F.R. § 668.14(b)(22) provides that an institute that participates in any Title IV, HEA program agrees, in part, that:

> (i) It will not provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity, or in making decisions regarding the award of title IV, HEA program funds . . . .

> (ii) Notwithstanding paragraph (b)(22)(i) of this section, eligible institutions, organizations that are contractors to eligible institutions, and other entities may make -- . . . (B) Profit-sharing payments so long as such payments are not provided to any person or entity engaged in student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds. . . .

34 C.F.R. § 668.14(b)(22).

37.     On March 17, 2011, the Department issued guidance focusing on, among other things, the regulations' impact on incentive compensation.  *See* Mar. 17, 2011 Letter, GEN-11-05, "Implementation of Program Integrity Regulations" (attached as **Exhibit A**), http://ifap.ed.gov/dpcletters/attachments/GEN1105.pdf.

### 1.    The "Bundled Services" Exception

38.    Although not mentioned in either the statute or regulation, the DOE's guidance suggests there may be an exception on tuition-sharing for service providers who provide multiple services in addition to recruitment.[1]   Under this so-called "bundled services" exception to the incentive compensation ban, tuition may be used as a source of revenue from which compensation is paid to an unrelated third party for a variety of bundled services.  *See* Exhibit A at 10.  DOE has stated,

> the Department does not consider payment based on the amount of tuition generated by an institution to violate the incentive compensation ban if that payment compensates an unaffiliated third party that provides a set of services that may include recruitment services.

*Id*. at 11.

39.    Bundled services can include "marketing, enrollment application assistance, recruitment services, course support for online delivery of courses, the provision of technology, placement services for internships, and student career counseling."  *Id*. at 12.

40.    An institution "may pay the entity an amount based on tuition generated for the institution by the entity's activities for all bundled services that are offered and provided collectively."  *Id*.

41.    However, "tuition sharing" or profit sharing – that is, where gross tuition is used as a measure of the compensation paid to the third-party entity – is prohibited.  *See* Exhibit A at 10.

42.    DOE discussed tuition sharing in its guidance, explaining that it is prohibited by § 487(a)(20) of the HEA:

> "**Tuition sharing:**"" The Department has been informed that some third parties charge institutions a percentage of tuition as a way of assuming the business risk

---

[1] Relator does not concede that such an exception, mentioned in neither statute nor regulation, exists or is consistent with congressional intent.

associated with student recruitment. Further, such third parties have typically combined student recruitment services with other services not covered by the incentive compensation prohibition, such as advertising, marketing, counseling, and support services to admitted students, and verification of student aid application information.

Section 487(a)(20) of the HEA mandates that the "institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." ***The Department generally views the payment based on the amount of tuition generated as an indirect payment of compensation based on success in recruitment and therefore a prohibited basis upon which to measure the value of the services provided.*** This is true regardless of the manner in which the entity compensates its employees.

Exhibit A at 11.

43.     Defendants do not satisfy any bundled services exception in any event because the primary services they were provided were recruitment and enrollment.

## 2.     Affiliated Contractors May Not Share Revenue

44.     Defendants have violated the law for an additional reason.  Even if a vendor can satisfy the requirements of a bundled services exception, the vendor must be unaffiliated with *any* educational institution.  DOE has explained that bundled services, including recruiting, may be provided by "[a] third party that is not affiliated with the institution it serves and is not affiliated with any other institution that provides educational services."  Exhibit A at 12.  Because NGU has a 33% ownership in Joined, NGU as well as SDCC and ORU were in violation of the HEA by obtaining recruitment services from Joined.

### C. ENFORCEMENT OF THE HEA

45.     The obligations of Defendants for receipt of Title IV funding, as previously alleged, were and are continuing in nature.  Defendants are not entitled to receive Title IV funds absent material compliance with these statutory, regulatory, and contractual obligations.  Violation of the

incentive compensation ban is a material breach of the program participation agreements entered by NGU, SDCC, and ORU.

46.    The DOE has the authority to demand repayment of all Title IV funds dispersed during the time NGU, SDCC, and ORU were in a revenue-sharing contract with Joined.  *See* June 2, 2015 DOE Memorandum, "Enforcement of the statutory prohibition on payment of incentive compensation by postsecondary institutions," (attached as **Exhibit B**), http://ifap.ed.gov/eannouncements/attachments/061015EnforcementProhibitionOnIncentiveCompPayAttachment.pdf;  *see also* Derek T. Teeter, July 13, 2015 Article, "U.S. Department of Education will aggressively enforce incentive compensation ban," http://www.highereducationlegalinsights.com/2015/07/u-s-department-of-education-will-aggressively-enforce-incentive-compensation-ban/.

## II.    THE FALSE CLAIMS ACT

47.    The federal False Claims Act ("FCA") provides that any person who knowingly presents or causes another to present a false or fraudulent claim for payment or approval that calls on the government fisc is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the government.  31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B).  An educational institutions receipt of Title IV funds when in violation of the HEA and DOE regulations states a claim under the False Claims Act.  *See U.S. ex rel. Main v. Oakland City University*, 426 F.3d 914 (7th Cir. 2005).

## FACTS

### I.    NGU

#### A.  THE FORMATION OF JOINED

48.    Relator Shoe worked for an educational consulting company known as Hobsons from 2012 to approximately October 2013.  During his tenure at Hobsons, Shoe became acquainted

with NGU President James Epting.  Hobsons had approached Defendants NGU and SDCC about providing recruitment services, but shied away from a profit-sharing arrangement. In October 2013, Shoe had a fundamental disagreement with Hobsons and left to found Joined, a company that would recruit adult students for educational institutions.  Epting approached Shoe at this point and, upon learning of Shoe's plan, offered to invest in the venture.

49.    Epting was completing his 35th year with NGU and 22nd year as its President. Epting began his tenure as President of NGU in 1991, when the school was a two-year college with 329 students and closure seemed imminent.  Under Epting's leadership, NGU began offering four-year degrees by 1994 and attained University status in 2005.  In 2013, NGU added a satellite location at the Tim Brashier Center in Greenville, housing the university's MBA program.  By 2015, NGU had rocketed its student population to in excess of 2,300 through its aggressive enrollment efforts.

50.    Consistent with his aggressive efforts to increase NGU's student population, in or about November 2013, Epting agreed with Shoe to form a company that would recruit students for adult online and satellite programs in exchange for a $2.5 million loan from NGU and NGU's 33% ownership in the company.  Epting anticipated that the company would both recruit students for NGU and serve other universities and colleges.  Epting treated it as a win-win business model: it would feed students to NGU's online and satellite programs and also generate revenue for NGU to the extent that NGU had an ownership position in this entity and could benefit from revenue secured from other educational institutions that might pay for student recruitment.

51.    By January of 2014 a deal was in place.  On or about January 23, 2014, with the advice and drafting of NGU''s law firm, the documents essential to commencement of operations for an entity known as Joined were in place, including Amended and Re-stated Bylaws, a

Subscription Agreement, a Shareholders' Agreement, and a Promissory Note covering NGU's $2.5 million loan to Joined. NGU became a 33% owner of Joined. Pursuant to the Joined Inc. Shareholders' Agreement, dated January 22, 2014 (attached as **Exhibit C**), moreover, NGU controlled 50% of Joined through its appointed Board members, Epting and Sewell, each of whom had two votes, versus the one vote held by each of the other four Board members.

### B. THE OPERATIVE DOCUMENTS

52.    A "Subscription Agreement," effective January 22, 2014 (attached as **Exhibit D**), tied together and memorialized NGU's loans to Joined, NGU's ownership interest in Joined, and Joined's initial obligations.

53.    Paragraph 1 of the Subscription Agreement states that "[u]pon the execution and delivery of this Agreement by NGU, Joined shall issue to NGU 330,000 shares of Common Stock of Joined (the "Shares") and deliver to NGU a stock certificate evidencing ownership of such Shares." *Id*. at 1. Such shares represented approximately 33% of Joined's shares as of January 22, 2014."

54.    Paragraph 2 of the Subscription Agreement states:

Upon the execution and delivery of this Agreement by Joined, NGU shall loan to Joined One Million Five Hundred Thousand Dollars ($1,500,000.00) as an initial loan to cover startup capital costs and certain operating expenses for the calendar year 2014 (the "Initial Loan"). At the request of Joined, NGU, may, but is not obligated to, loan Joined up to an additional One Million Dollars ($1,000,000.00) ("Additional Loan") (collectively with the Initial Loan, the "Loans") to cover additional operating expenses. The commencement and details of repayment of the Loans shall be as set forth in Section 3 below and in the Promissory Note.

*Id*.

55.    Section 3 of the Subscription Agreement states:

As set forth and detailed on the Promissory Note and unless otherwise accelerated pursuant to section 4 below, Joined shall be obligated to repay the Loans as follows: (i) monthly payments of accrued interest on the initial Loan and any disbursements made under the Additional Loan shall commence on the date set forth in the

> Promissory Note. and (ii) monthly principle payments on the Initial Loan and any amounts disbursed under the Addition (sic) Loan shall commence in the month immediately following Profitability (hereinafter defined); provided, however, that, regardless of Profitability, the entire balance including principal, interest, fees, premiums, charges and costs and expenses then outstanding on the loans will be due and payable in full on or before December 31, 2017.

*Id.* at 1-2.

56.    A separate Promissory Note (attached as **Exhibit E**) established the terms by which the Loan would be repaid and set interest in favor of NGU at a rate of 10%.

57.    Joined's obligations to NGU were, in part, established by the Subscription Agreement. Paragraph 4(a) states:

> Joined shall immediately commence operations and take reasonable efforts to market, enroll and retain both non-campus graduates and undergraduate students in applicable online courses provided by. [sic] As set forth in the Business Plan, which is attached hereto as <u>Exhibit B</u> (The "Business Plan"), in addition to other representations and plans made to NGU, Joined has represented that it will commence enrollment efforts by May 1, 2014 and will enroll at least 150 students within the first calendar year (the "Enrollment Benchmark"). If NGU reasonably believes Joined is not performing its obligations or making necessary advancements in student enrollment, retainment, and related services (measurements to include, but not limited to, the Business Plan and the Enrollment Benchmark), NGU shall have the right to declare a default on the Promissory Note and accelerate payment of the Loans in accordance with the terms of the Promissory Note.

Exhibit D at 2.

58.    By Written Consent in Lieu of an [Sic] Meeting of the Shareholders of Joined Inc., dated January 22, 2014 (attached as **Exhibit F**), the Joined Board of Directors was elected, including Epting, and the Amended and Restated Bylaws of Joined, Inc. (attached as **Exhibit G**) were adopted.  Article II, Section 2.1(b) of the Amended and Restated Bylaws memorializes the following:

> The Board shall have six (6) members, two (2) of which shall be elected (or their successor selected) by the affirmative vote of North Greenville University (The "NGU Directors") and four (4) of which shall be elected (or their successors elected) by the affirmative vote of the remaining shareholders voting on an aggregate basis as a single class or voting group (the "Remaining Directors"). The

NGU Directors shall each have (2) votes (or 50% of the voting power of the Board in the aggregate) and the Remaining Directors shall each have one (1) vote (or 50% of the voting power of the Board in the aggregate), which, for purposes of clarity, total six (6) members of the Board with a total of eight (8) votes in the aggregate.

Exhibit G at 5.

59.     Article I, Section 1.8(b) of the Amended and Restated Bylaws delineates a series of major decisions that could only be made with a vote of 75% of the Directors, thus requiring NGUs approval on all such decisions.  *Id.* at 3.

60.     On or about March 5, 2014, NGU and Joined executed a Services Agreement (attached as **Exhibit H**) which was retroactively effective as of March 1, 2014.

61.     The Services Agreement was signed by Relator on behalf of Joined and Epting on behalf of NGU.  *Id.* at 14.  It recited that "Joined is a California Company engaged in the business of marketing educational institutions to the general public *for the purpose of enrolling students in internet classes*, both as underclassmen and in graduate programs offered by the institutions." *Id*. at 1.

62.     Pursuant to Exhibit "A" to the Services Agreement, the services provided by Joined included "marketing," "student acquisition," "student retention," and "satellite location expansion," where Joined would purportedly search for new markets and locate and provide classrooms for satellite programs. *Id.* at 6.

63.     The Services Agreement, Paragraph 1.1, defined "marketing" as follows:

Marketing – shall include all traditional Media advertisement, such as radio, television, and Outdoor, and shall also include internet advertisement in the social media, PPC, SEO, and Landing Pages, and also assisting University with local advertising with business, manufacturing, churches and technical schools.

*Id.* at 1.

64.     Paragraph 1.3 of the Services Agreement, defined "Student Retention" as follows:

Student Retention – shall include reasonable efforts to assist internet students, prospective students and graduate students with selection of University as their educational institution, and then supporting those students with telephone calls, chat rooms, and reminders to continue to renew their enrollment with University.

*Id.*

65.    Paragraph 2.d of the Services agreement provides:

Joined shall not be responsible or have authority over any course or Program, including but not limited to its content, teaching method, development, staff, structure or grading. Joined may provide input to University related to the costs, fees, class sizes, dates, financial aid, and other elements that impact the marketability and success of the Programs, however, University shall have the final approval over all elements of the Programs.

*Id.* at 2-3.

66.    The Services Agreement, Paragraph 3.a, compensated Joined as follows:

As compensation for the Services provided by Joined, ***Joined will be paid fifty percent (50%) of the gross tuition revenue actually received by University from Program Students*** during the term of this Agreement. Joined will invoice University on a monthly basis by the 10th day of each month for all revenue scheduled to be received during the prior calendar month. University will adjust the invoice for the actual tuition received from Program Students. The adjusted invoice will be due and payable by University no later than the last day of the same month. University is solely responsible for collection of all tuition and fees from the Program Students, and agrees to use good faith efforts to collect tuition and fees that become due.

*Id.* at 3.

67.    The only metric set forth to gauge Joined's A revenue projection attached as "Exhibit C" to the Services Agreement (set forth below) projected that Joined would be able to enroll a total of 4981 students and receive a "revenue share" of one half of $54,787,686 in tuition projected to be collected from 2014-2018. *Id.* at 17.

EXHIBIT "C"
JOINED'S INITIAL 5-YEAR PROJECTED ENROLLMENT/REVENUE FORECAST
(To be updated annually)

|  | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|
| Enrollments | 150 | 900 | 1080 | 1296 | 1555 | 4981 |
| Total Revenue | $648,000 | $6,358,500 | $11,482,256 | $15,945,490 | $20,353,402 | $54,787,648 |
| Revenue Share | $324,000 | $3,179,250 | $5,741,128 | $7,972,745 | $10,176,701 | $27,393,824 |

68.     Thus the only metric applied to gauge Joined's success and revenue was enrollment of students.

69.     All of the foregoing documents were prepared, in part, by Smith Moore Leatherwood LLP, counsel to NGU.

C.     **THE OPERATIONS**

70.     Consistent with the obligations of the Subscription Agreement and Services Agreement, Joined actively recruited students for NGU and submitted invoices for 50% of the tuition received by NGU for each student recruited by Joined.  Each invoice lists the names of recruited students, the amount of tuition received by NGU, and the money to be remitted to Joined.  By way of example, Joined Invoice NGU080115 (Attached as Exhibit I), dated August 1, 2015, lists the names of 86 students Joined recruited for NGU and seeks $114,750 – representing half the tuition collected by NGU – in payment.  NGU paid commissions to Joined in excess of $600,000 for recruitment services in 2014, another $500,000 in 2015, and still owes Joined more than $850,000.

71.     As described in further detail below, with the knowledge and consent of the Joined Board of Directors, including Epting and Sewell, Joined expanded its services under the same or similar agreements with Defendants SDCC and ORU, and William Jessup University.

72.     By the close of 2014, Joined was experiencing financial problems as its marketing cash outlay, driven by the recruiting demands of its biggest customer, NGU, was not satisfied by Joined's revenue stream or line of credit.  Though Joined had benefited from the drawdown of $2.5 million under its loan agreement with NGU, it needed an additional cash injection, which was promised by Epting.

73.     In or about January 2015, Shoe learned that Epting would be taking a sabbatical and leaving NGU.  With Epting out of the picture, Shoe asked Sewell on February 9, 2015, whether NGU would sell its stock back to Joined so that Joined could find other investors (attached as **Exhibit J**, at 4).  NGU refused the request on March 4, 2015, *id.* at 2, and, Shoe responded to Sewell stating, "In light of that decision, I must now ask if NGU, as our sole investor, is willing to infuse some much needed cash to help us through the next 6 months."  *Id*. at 1.   One day later, on March 5, 2015, Sewell emailed Shoe stating, "[We] are not now in a position to increase our investment. . . .  We are completely tuition driven and we would be dramatically affected by even a slight dip in enrollments." *Id.*.

74.     By letter of March 13, 2015 (attached as **Exhibit K**), Sewell advised Relator that the NGU Board of Trustees had appointed Randall Pannell as interim President and that Pannell would be replacing Epting as a Board member of Joined.  The letter requested that Joined hold a Board meeting on March 25, 2015 and advised Shoe that NGU would begin billing Joined for principal and interest on the Promissory Note.

75.     With obligations due on the Promissory Note, and expenditures required to meet NGU, SDCC, and ORU's high recruitment goals, Joined's financial situation deteriorated.  On or about August 13, 2015, Pannell transmitted a letter to Relator terminating the Services Agreement (attached as **Exhibit L**).  The letter states in relevant part:

This follows our prior letter to you of July 14, 2015 in which the University advised you that the Company was in default of Section 8 of the Services Agreement as a result of its failure to comply with all ""governmental ... laws"" by failing to comply with federal and state payroll tax laws and the University requested pursuant to Section 11 of the Services Agreement that the Company cure such default by satisfying its outstanding federal and state payroll tax obligations. As a result of the Company failing to affect the cure of its default, pursuant to Section 11 of the Services Agreement, the University now hereby terminates the Services Agreement effective immediately.  In addition, pursuant to item (iv) of the 4th paragraph of the Note, the breach of any other agreement with the University also constitutes a breach of the Note.  Accordingly, the University hereby elects to accelerate all amounts due under the Note and hereby demands that the Company immediately pay all interest and principal under the Note.

76.     The compensation scheme set forth in the Services Agreement between NGU and Joined violated the HEA statute, 20 U.S.C. § 1094(a)(20), and DOE regulations both because compensation was tied, directly or indirectly, to Joined's recruitment success and because Joined, which was partly owned by NGU, was not an "unaffiliated third party."

77.     With the cancellation of the NGU Services Agreement, Relator consulted others in the industry and learned for the first time in December 2015 that the agreement with NGU and NGU's participation in Joined through an equity position, and otherwise through a joint-employer role, was unlawful.

## II.     SDCC

78.     On or about March 28, 2014, SDCC and Joined executed a ten-year Services Agreement (attached as **Exhibit M**), pursuant to which Joined would be "paid fifty percent (50%) of the gross tuition revenue" received from students who enroll during the agreement.  *Id.* at 2. SDCC was aware that NGU was a part-owner of Joined, as that fact had been used to market Joined's services to other faith-based institutions.

79.     Pursuant to "Exhibit A" to the SDCC Services Agreement, Joined purportedly provided services related to "Marketing," "Student Acquisition," "Student Retention," "Satellite Location Expansion," and "Manage State Authorization Process To Ensure SDC Remains in

Compliance*." Id.* at 13-14.  In fact, all services provided by Joined were related to recruitment and retention of students.  "Exhibit C" to the SDCC Services Agreement, *id*. at 15, sets forth an "Initial 5-Year Enrollment/Revenue Forecast" as follows:

EXHIBIT "C"
INITIAL 5-YEAR ENROLLMENT/REVENUE FORECAST
(To be updated annually)

|  | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|
| Enrollments | 300 | 900 | 1080 | 1296 | 1555 | 5056 |
| Total Revenue | $1,695,524 | $7,391,832 | $12,542,864 | $17,117,310 | $21,702,826 | $60,450,356 |
| Revenue Share | $847,762 | $3,695,916 | $6,271,432 | $8,558,655 | $10,851,413 | $30,225,178 |

80.    Joined was anticipated to earn $30,225,178 in SDCC tuition, including Title IV funding, by enrolling more than 5,000 students in the first five years.  In fact, SDCC paid Joined in excess of $1,500,000 pursuant to the March 28, 2014 Services Agreement.  By way of example, Joined Invoice SDCC013115, dated January 31, 2015 (attached as **Exhibit N**), from Joined to SDCC, lists 76 students, the tuition they paid to SDCC, which includes Title IV funds, and the half of the tuition payable to Joined, $40,470.

81.    Joined's compensation – 50% of the tuition SDCC received for each student that enrolled – was directly, or at least indirectly, affected by its success in recruiting and enrolling students for SDCC's.   Further, SDCC's revenue included Title IV funds.

82.    While Joined purportedly provided additional services, the only metrics used to measure Joined's success and calculate its pay are enrollment goals.  Indeed, a December 3, 2015 amendment to the Services Agreement (attached as **Exhibit O**), providing "conditions" for the continuation of the contract, sets forth a "[g]uaranteed recruitment goal[]" of 180 students within the first three months of 2016 or else "Joined will forfeit all future revenue…." *Id*. at 1.

83.    The compensation scheme set forth in the Services Agreement between SDCC and Joined violated the HEA statute, 20 U.S.C. § 1094(a)(20), and DOE regulations both because

compensation was tied, directly or indirectly, to Joined's recruitment success and because Joined, which was partly owned by NGU, was not an "unaffiliated third party."

## III.    ORU

84.    On or about May 23, 2014, ORU entered into a fee-for-service agreement with Joined (attached as **Exhibit P**).  ORU was aware that NGU was a part-owner of Joined, as that fact had been used to market Joined's services to other faith-based institutions.

85.    Pursuant to the agreement, Joined provided digital marketing and student recruitment.  The only metric used to measure Joined's success was the expressed goal that Joined "[d]eliver . . . 130 – 165 qualified students for enrollment."  In return, ORU paid Joined a set fee totaling $750,000.  That agreement terminated on November 30, 2014.

86.    On or about February 6, 2015, ORU entered into a new Services Agreement with Joined (attached as **Exhibit Q**).  Specifically, as shown below, compensation was calculated as 40% of ORU's net revenue and a variable amount to cover Joined's expenses:

> 10.    "Compensation" – shall mean, in full payment of the Services provided by Joined to ORU pursuant to this Agreement, the amount ORU shall reimburse and/or pay Joined as set forth below:
>
> > a.    Joined Expenses in an amount not to exceed the sum total of the Year 1 Joined Committed Expenses plus the Year 2 Joined Committed Expenses plus the Year 3 Joined Committed Expenses; plus
> >
> > b.    Forty percent (40%) of the Net Revenue during the Term.
>
> ORU's obligation to pay the Compensation is contingent on Joined's performance of all Services and the amount of Compensation can be adjusted if the minimum expectations are not achieved.
>
> 11.    "Credit" – shall mean the amount by which payments from ORU to Joined exceed the amount of Compensation payable to Joined pursuant to this Agreement.

87.     Compensation was anticipated to reach $900,000 for the term of the contract (July 1, 2015 to January 31, 2016).  In return for the compensation, Joined was to provide "Marketing . . . Student Recruitment . . . [and,] Student Retention" services.  *Id.* at Ex. A.  In fact, ORU paid Joined in excess of $945,000 pursuant to the February 6, 2015 Services Agreement.  By way of example, Invoice INV-0035, dated April 3, 2015, from Joined to ORU sought $150,000 in "[t]uition share." (Attached as **Exhibit R**).

88.     Although no specific metric of enrollments is set forth in the Services Agreement, it provides that "the amount of Compensation can be adjusted if the minimum expectations are not achieved."  In any event, Joined's compensation – 40% of ORU's net revenue – was directly, or at least indirectly, affected by its success in recruiting and enrolling students for ORU.   Further, ORU's revenue included Title IV funds.

89.     The compensation scheme set forth in the Services Agreement between ORU and Joined violated the HEA statute, 20 U.S.C. § 1094(a)(20), and DOE regulations both because compensation was tied, directly or indirectly, to Joined's recruitment success and because Joined, which was partly owned by NGU, was not an "unaffiliated third party."

<u>**COUNT ONE**</u>

***(Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A))***

90.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

91.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1).

92.     By virtue of the conduct described above, Defendants knowingly caused to be presented to DOE certified applications for Title IV funds while each was in violation of the incentive compensation ban.  20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22)(i).

93.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendant caused, paid for claims that otherwise would not have been allowed.

94.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

**COUNT TWO**

***(Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B))***

95.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

96.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

97.     By virtue of the conduct described above, Defendants knowingly caused to be made or used false records or statements that caused false claims to be paid or approved by the United States Government.

98.     The United States, unaware of the falsity or fraudulent nature of the claims that Defendant caused, paid for claims that otherwise would not have been allowed.

99.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

**REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

## **PRAYER FOR RELIEF**

**WHEREFORE:**  Plaintiff-Relator requests that judgment be entered against Defendants, ordering that:

(i)      Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729, *et seq*.;

(ii)      Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

(iii)      The Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

(iv)      The Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

(v)      Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

(vi)      Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

(vii)      The United States and the Relator recover such other relief as the Court deems just and proper.

[signature page follows]

Respectfully submitted by:


/s/ Richard A. Harpootlian
Richard A. Harpootlian, Fed. ID No. 1720
rah@harpootlianlaw.com
Christopher P. Kenney, Fed. ID No. 11314
cpk@harpootlianlaw.com
**RICHARD A. HARPOOTLIAN P.A.**
1410 Laurel Street
Post Office Box 1090
Columbia, SC 29202
Tel: (803) 252-4848
Fax: (803) 252-4810


**GUTTMAN, BUSCHNER & BROOKS PLLC**
Reuben A. Guttman
rguttman@gbblegal.com
Paul Zwier
pzwier@gbblegal.com
Elizabeth H. Shofner
lshofner@gbblegal.com
2000 P Street, N.W., Suite 300
Washington, DC 20036
Tel: (202) 800-3001
Fax: (202) 827-0041


**BIENERT, MILLER & KATZMAN, PLC**
Thomas H. Bienert, Jr.
tbienert@bmkattorneys.com
Michael R. Williams
mwilliams@bmkattorneys.com
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Tel: (949) 369-3700
Fax (949) 369-3701


*Attorneys for Plaintiff - Relator*
*MAURICE SHOE*

May 16, 2016
Columbia, South Carolina.

27